UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 1:24-cr-00055-SEB-MJD |
| ROBERT REED, | ) ) | -01 |
| Defendant. | ) ) | |

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

Shortly after midnight on Friday, February 16, 2024, Defendant Robert Reed ("Mr. Reed") was driving through rural Hancock County, Indiana, attempting to locate the nearest on-ramp to Interstate 70 ("I-70") towards Indianapolis. The recent construction of several new roadway roundabouts in that area, coupled with Mr. Reed's general unfamiliarity with that locale and his inexperience using his cell phone GPS, rendered Mr. Reed's navigational efforts unavailing. After spotting a fully marked police vehicle parked nearby, Mr. Reed stopped, exited his vehicle, and approached the officer to ask for directions. Believing that Mr. Reed's circuitous driving pattern evidenced signs of possible intoxication, the officer, Hancock County Sheriff's Deputy Joshua Cochard ("Deputy Cochard"), conversed briefly with Mr. Reed and administered three standardized field sobriety tests, each of which Mr. Reed failed.

Mr. Reed declined a portable breathalyzer test as well as a blood draw, after which Deputy Cochard placed him under arrest. A subsequent search of Mr. Reed's vehicle re-vealed a firearm stored in the center console. Mr. Reed is charged in the Indictment with

1

one count of Unlawful Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1).

Now before the Court is Mr. Reed's Motion to Suppress, filed on January 27, 2025, pursuant to which he seeks the suppression of all evidence derived from his warrantless arrest and the subsequent search of his vehicle. Dkt. 46. At a hearing on April 14, 2025, the Court heard the parties' evidence, including the testimony of Deputy Cochard and Mr. Reed. For the reasons detailed below, Mr. Reed's Motion to Suppress is **DENIED**.

## FACTS

On February 16, 2024, at approximately 1:30 a.m., on-duty Sheriff's Deputy Cochard was patrolling traffic along County Road 200 North ("200N") in Hancock County. As he approached the intersection of County Road 700 West ("700W") from the west, just a "jog north of the interstate," dkt. 47-1 at 3, Deputy Cochard noticed a stationary Kia Optima sitting in the westbound traffic lane of 200N. Alerted by the unusual sight of the idling car and the potential safety hazard it posed, Deputy Cochard made a U-turn and began to follow the Kia (without activating his emergency lights or sirens) remaining behind approximately fifty feet. The Kia traveled west for a short distance before making its own U-turn and heading east towards the intersection with 700W, where the Kia made a righthand turn and headed south. This route is traceable in the map below:



Dkt. 57-1 at 3.[1]

Both vehicles continued south on 700W until the Kia turned onto 200N, which was a "jog south of the interstate," where Deputy Cochard observed the Kia "come to a complete stop at the next couple of small roundabouts," despite the absence of other vehicular traffic. Dkt. 47-1 at 3. The Kia entered a newly constructed but unoccupied senior living complex, which Deputy Cochard knew had no other points of ingress and egress. Deputy Cochard parked his patrol vehicle at the entrance of the senior living complex, from which location he observed the Kia "driving around the parking lot" as if "attempting to locate an exit." *Id.*

---

[1] The portion of "200N" located south of I-70 denotes the old roadway that existed prior to the completion of the roadway labeled "W CR 200 N." (For digital viewers, the former is highlighted in blue, and the latter is marked in gray.) The events described herein occurred on the new section of roadway (and its various roundabouts) labeled as "W CR 200 N."

3

After looping around the complex and returning to the entrance, the Kia stopped in front of Deputy Cochard's vehicle. The driver and sole occupant, Mr. Reed, exited the Kia, approached Deputy Cochard (prompting Deputy Cochard to exit his vehicle as well), and stated that he was lost and in need of directions to the interstate. Mr. Reed's cell phone GPS, which he showed to Deputy Cochard, was set to a destination in Indianapolis, Indiana.

While speaking to Mr. Reed from approximately an arm's length away, Deputy Cochard reported that he "could smell the odor of an alcoholic beverage emitting from [Mr. Reed's] breath" and that he thought Mr. Reed displayed "unsteady balance . . . , glassy and pinpoint eyes," and slurred speech. Dkt. 47-1 at 3. Deputy Cochard asked Mr. Reed about his alcohol consumption, to which Mr. Reed responded that he had had none.

With Mr. Reed's consent, Deputy Cochard administered three standardized field sobriety tests: the Horizontal Gaze Nystagmus test (the "HGN test"); the "walk and turn" test; and the "one leg stand" test.[2] Beginning with the HGN test, Deputy Cochard observed Mr. Reed's eyes for nystagmus, the involuntary jerking movement of one's eyes that is typically exaggerated by the consumption of alcohol or other central nervous system depressants. Deputy Cochard noted a "lack of smooth pursuit in both eyes, distinct and sustained

---

[2] In addition to Deputy Cochard's and Mr. Reed's respective testimonies, the evidentiary record includes the body worn camera footage from Sheriff's Deputy Anthony Forshey ("Deputy Forshey"), who arrived on-scene shortly before Deputy Cochard began administering the tests. Dkt. 48. Although Deputy Cochard's uniform and patrol vehicle were each equipped with cameras, neither his body worn camera nor his dash cam captured any footage until after Mr. Reed had been arrested. At the evidentiary hearing, Deputy Cochard testified that the nonactivation of his body worn camera and dash cam was unintentional and that he started the cameras as soon as he realized that they had not been operating.

nystagmus at maximum deviation in both eyes, and onset of nystagmus prior to a 45 degree angle in both eyes," leading him to conclude that Mr. Reed "exhibited six of six possible clues" of intoxication. Dkt. 47-1 at 4.

Next, Deputy Cochard administered the "walk and turn" test, which required Mr. Reed to take nine heel-to-toe steps along an imaginary line, turn 180 degrees, and repeat. As Deputy Cochard gave verbal and demonstrative instructions, Mr. Reed began taking steps, despite repeated directions that he begin only after being told to do so. Dkt. 48 at 05:58, 06:22. In Deputy Cochard's view (and as reflected in the probable cause affidavit), Mr. Reed showed the following five (of eight) clues of intoxication: "can't balance during instructions, starts too soon, stops while walking, misses heel to toe, [and] turns improperly." Dkt. 47-1 at 2.

The final test, the "one leg stand" test, required Mr. Reed to raise one foot above the ground and count out loud until instructed to stop. Mr. Reed held his raised foot for approximately twelve seconds, dropped his foot, and lifted his foot again for an additional seven seconds. Dkt. 48 at 09:50–10:15. Deputy Cochard concluded that Mr. Reed exhibited two of four clues and thus failed the test by "sway[ing] side to side[ ] and put[ting] his foot down." Dkt. 47-1 at 2.

Based on these observed clues of intoxication, Deputy Cochard believed that further investigation was necessary to determine whether (or to what extent) Mr. Reed was, in fact, intoxicated. When asked to take a portable breathalyzer test—which Deputy Cochard referred to as a "PBT"—Mr. Reed declined, insisting that he had passed the field sobriety

5

tests, that he was not drunk, and that he only sought to return home. *See* dkt. 48 at 10:25–10:50.

Deputy Cochard advised Mr. Reed of Indiana's "implied consent" law, which deems any "person who operates a vehicle" to have "impliedly consent[ed] to submit to . . . chemical test[s] . . . as a condition of operating a vehicle in Indiana." Ind. Code § 9-30-6-1. Mr. Reed once again declined further testing.

Deputy Cochard placed Mr. Reed under arrest before transporting him to the Hancock Regional Hospital and requesting a search warrant for a blood draw. Meanwhile, Sheriff's Deputy Kaleb Arnold, who had previously arrived on-scene, completed an inventory search of Mr. Reed's vehicle and found a loaded Accu-Tek .380 caliber semiautomatic handgun in the center console.

The Hancock County Superior Court issued a search warrant authorizing a blood draw of Mr. Reed, and an ensuing toxicology report revealed a blood alcohol concentration of 0.01 ng/100 ml as well as the presence of amphetamines and methamphetamines. Dkt. 47-2 at 1–2.

On April 3, 2024, Mr. Reed was indicted for the Unlawful Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1). On January 27, 2025, Mr. Reed moved to suppress the evidence resulting from his warrantless arrest, including the firearm found in the center consol of the Kia. Mr. Reed contends that Deputy Cochard did not have probable cause to suspect that he was intoxicated, thereby making his arrest and the subsequent search of his vehicle violative of the Fourth Amendment's protections

against unreasonable searches and seizures. Without probable cause to justify his arrest, Mr. Reed argues, the evidence derived from the search of his vehicle must be suppressed.

The Court conducted an evidentiary hearing on April 14, 2025, during which both Deputy Cochard and Mr. Reed testified, and thereafter took the matter under advisement. On April 23, 2025, Mr. Reed submitted a post-hearing memorandum in support of his Motion to Suppress. Dkt. 60. The motion is now fully briefed and ripe for ruling.

## LEGAL ANALYSIS

"Warrantless searches are '*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions,' " one of which bears on the case at bar. *United States v. Davis*, 119 F.4th 500, 504 (7th Cir. 2024) (quoting *United States v. Salazar*, 69 F.4th 474, 477 (7th Cir. 2023)). A search incident to a lawful arrest permits an officer to "search [a] vehicle if 'it is reasonable to believe the vehicle contains evidence of the offense of arrest.' " *United States v. Paige*, 870 F.3d 693, 702 (7th Cir. 2017) (quoting *Arizona v. Gant*, 556 U.S. 332, 351 (2009)). "[W]arrantless searches incident to arrest are permissible only when the underlying arrest is lawful," *Davis*, 119 F.4th at 505, which is to say that the arrest must be supported by probable cause, *Virginia v. Moore*, 553 U.S. 164, 177 (2008).

"Officers have probable cause to arrest when the facts and circumstances known to them 'reasonably support a belief that the individual has committed, is committing, or is about to commit a crime.' " *Davis*, 119 F.4th at 505 (quoting *Doe v. Gray*, 75 F.4th 710, 718 (7th Cir. 2023) (evaluating probable cause to make an arrest in § 1983 lawsuit)). "Whether probable cause exists is a 'commonsense, practical question' made by considering

7

the totality of the circumstances." *United States v. Hill*, 818 F.3d 289, 294 (7th Cir. 2016) (quoting *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983)). "This flexible, commonsense approach does not require that the officer's belief be correct or even more likely true than false, so long as it is reasonable." *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999). Furthermore, "an arrest may be supported by probable cause that the arrestee committed *any* offense, regardless of which crime was charged or which crime the officer thought had been committed." *Gutierrez v. Kermon*, 722 F.3d 1003, 1012 n.3 (7th Cir. 2013) (emphasis in original). The Government bears the burden of proving probable cause by the preponderance of the evidence. *See United States v. Matlock*, 415 U.S. 164, 177–78 & n.14 (1974).

Applying these principles in the case at bar, we conclude that the Government has met its burden of showing, by the preponderance of the evidence, that Deputy Cochard had probable cause to arrest Mr. Reed. The relevant facts and circumstances known to Deputy Cochard at the time of Mr. Reed's arrest included Deputy Cochard's observations that, at approximately 1:30 in the morning, in an isolated area of the county, Mr. Reed had displayed several unusual driving behaviors, such as bringing his car to a complete stop in a traffic lane, conducting a U-turn soon after a law enforcement vehicle began following him, and stopping his car at multiple roundabouts despite the lack of other vehicular traffic; that Mr. Reed's breath smelled of alcohol; that Mr. Reed had glassy and pinpoint eyes and slurred speech; and that Mr. Reed's performance on each field sobriety test yielded clues of intoxication. These observations are consistent with common indicia of intoxication, which generally include "(1) the consumption of a significant amount of alcohol; (2) impaired attention and reflexes; (3) watery or bloodshot eyes; (4) the odor of alcohol on the

8

breath; (5) unsteady balance; (6) failure of field sobriety tests; and (7) slurred speech." *Gutierrez*, 722 F.3d at 1012 (quoting *Fought v. State*, 898 N.E.2d 447, 451 (Ind. Ct. App. 2008)) (cleaned up).

In asserting that no probable cause existed for his arrest, Mr. Reed contends that he did not exhibit sufficient signs of intoxication or impairment such that Deputy Cochard's finding of probable cause was reasonable. Mr. Reed reasons that Deputy Cochard "testified falsely that he observed pinpoint pupils and six out of six nystagmus clues." Dkt. 60 at 3. According to the National Highway Traffic Safety Administration, nystagmus "may be evident" when a person's blood alcohol content reaches approximately 0.06 ng/100 ml. National Traffic Law Center, *Horizontal Gaze Nystagmus: The Science and the Law: A Resource Guide for Judges, Prosecutors and Law Enforcement* 17 n.26 (1999). By contrast, a 2023 study published by the Journal of Forensic and Legal Medicine found no association between degree of nystagmus and amphetamine consumption, and, as such, nystagmus cannot be regarded as a reliable indicator of amphetamine-induced impairment. *Nystagmus among suspected amphetamine impaired drivers.* Journal of Forensic & Legal Medicine. Volume 95, April 2023. https://doi.org/10.1016/j.jflm.2023.102502. Based on such scientific findings, Mr. Reed maintains that Deputy Cochard's stated observations concerning Mr. Reed's eyes are "too scientifically implausible," given his (relatively) low blood alcohol concentration of 0.01 as well as the noncorrelation between amphetamine consumption and nystagmus. Dkt. 60 at 2.

Mr. Reed further argues that Deputy Forshey's body worn camera footage contradicts Deputy Cochard's testimony regarding Mr. Reed's balance and demeanor. Mr. Reed

9

maintains that he "exhibited common and ordinary balance and coordination" and that he did not "exhibit[ ] slurred speech," *id.* at 3, and, as such, there was no probable cause for his arrest.

Taking into account the totality of the circumstances, we cannot agree with Mr. Reed that Deputy Cochard's finding of probable cause was unfounded or unreasonable. First, Mr. Reed's nystagmus theory fails to defeat Deputy Cochard's testimony that he observed six clues of nystagmus. While Mr. Reed's toxicology report ultimately revealed a 0.01 blood alcohol concentration, the amount of time between Deputy Cochard's reported observation of nystagmus and Mr. Reed's eventual blood draw remains unknown to us. *See Missouri v. McNeely*, 569 U.S. 141, 152 (2013) (for probable cause purposes, accepting that, "because an individual's alcohol level gradually declines soon after he stops drinking, a significant delay in testing will negatively affect the probative value of the [test] results"). Thus, Mr. Reed's insistence that nystagmus was "scientifically improbable" lacks a sufficient evidentiary basis from which we can justifiably discredit Deputy Cochard's unequivocal testimony to the contrary.

Similarly, the general noncorrelation between amphetamine consumption and nystagmus does not contravene Deputy Cochard's observations of nystagmus, particularly because there is no record evidence nor any expert opinion illuminating how the contemporaneous consumption of both a central nervous system depressant, such as alcohol, and stimulants, such as amphetamines, might affect observable signs of nystagmus. Nor have we been presented with evidence detailing whether, how, or to what extent the quantity of

amphetamines found in Mr. Reed's system might have impacted his own nystagmus or Deputy Cochard's ability to detect it.

The body camera footage likewise does not undermine Deputy Cochard's finding of probable cause. To the contrary, the footage confirms Deputy Cochard's observations, as noted in the probable cause affidavit, that Mr. Reed began the "walk and turn" test "too soon," struggled to maintain his balance as Deputy Cochard administered verbal instructions, and turned improperly; and that he swayed and put his foot down during the "one leg stand" test. Dkt. 47-1 at 2, 4. Deputy Cochard also recorded Mr. Reed as having "stop[ped] while walking" and as having "misse[d] heel to toe." Dkt. 47-1 at 2. To the extent that the video footage renders those observations debatable, the totality of the circumstances—including the remaining (and unrefuted) clues of intoxication and Deputy Cochard's testimony regarding Mr. Reed's unusual driving behaviors, alcoholic odor, glassy and pinpoint eyes, and slurred speech—adequately supports a finding of probable cause for Mr. Reed's arrest.

In sum, we find that Mr. Reed's arrest was supported by probable cause, and, as such, the subsequent search of his vehicle was permissible under the Fourth Amendment. *Davis*, 119 F.4th at 505. Mr. Reed's Motion to Suppress shall be denied accordingly.

## CONCLUSION

For these reasons, Mr. Reed's Motion to Suppress, dkt. 46, is **DENIED**.

IT IS SO ORDERED.

Date: 5/21/2025

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

11

Distribution:

Harold Samuel Ansell
INDIANA FEDERAL COMMUNITY DEFENDERS
Sam_Ansell@fd.org

Barry D. Glickman
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
barry.glickman@usdoj.gov